UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

KEISHA THOMAS, on behalf of her          CIVIL ACTION NO. 6:18-cv-01511
Minor Child, Q.J.F.

VERSUS                                   JUDGE SUMMERHAYS

U.S. COMMISSIONER,                       MAGISTRATE JUDGE HANNA
SOCIAL SECURITY
ADMINISTRATION

## REPORT AND RECOMMENDATION

Before the Court is an appeal of the Commissioner's finding of non-disability.

Considering the administrative record, the briefs of the parties, and the applicable

law, it is recommended that the Commissioner's decision be reversed and remanded

for further administrative action.

## Administrative Proceedings

The claimant, Keisha Thomas, acting on behalf of her minor son, Q.J.F., fully

exhausted her administrative remedies before filing this action in federal court. On

April 10, 2007,[1] Q.J.F. was found to be disabled due to speech and language

impairments. As of May 1, 2015, Q.J.F. was found no longer disabled due to

improvement in those impairments.[2] Ms. Thomas requested a hearing, which was

---

[1]    The ruling of April 2007 is not in the record.

[2]    Rec. Doc. 8-1 at 55, 56, 78-85.

held on July 21, 2017 before Administrative Law Judge Kathleen S. Molinar.[3]  The

ALJ issued a decision on March 22, 2018, concluding that Q.J.F.'s disability ended

as of May 1, 2015 and that he had not become disabled again since that date.[4]  The

claimant asked the Appeals Council to review the ALJ's decision, but the Appeals

Council found no basis for review.[5]  Therefore, the ALJ's decision became the final

decision of the Commissioner for the purpose of the Court's review.[6]  Ms. Thomas

then initiated this action, seeking review of the Commissioner's decision.

## Summary of Pertinent Facts

Q.J.F. was born on November 22, 2004.[7]  He was awarded Supplemental

Security Income ("SSI") benefits in 2007, at approximately two-and-a-half years of

age, due to speech and hearing problems.  He was ten years old when it was

determined that his disability had ended due to improvements in his speech and

language impairments.  At the time of the hearing, he was twelve years old.  At the

time of the ALJ's decision, he was thirteen years old.  He is now a few months shy

of his fifteenth birthday.

---

[3]     A transcript of the hearing is found in the record at Rec. Doc. 8-1 at 41-54.

[4]     Rec. Doc. 8-1 at 22-34.

[5]     Rec. Doc. 8-1 at 5.

[6]     *Higginbotham v. Barnhart*, 405 F.3d 332, 336 (5th Cir. 2005).

[7]     Rec. Doc. 8-1 at 55, 56, 224, 311.

The medical records from the Pediatric Group of Acadiana, Q.J.F.'s treating pediatricians, are primarily handwritten and difficult to read.  However, among the earliest notes is one from April 2005, when Q.J.F. was 4 ½ months old, which indicated that he had seen a cardiologist.[8]  On June 1, 2005, when Q.J.F. was six months old, the treatment note indicated that the doctor was "concerned about hearing."[9]  Nystagmus[10] was noted on March 30, 2005, when Q.J.F. was four months old,[11] on August 12, 2005 when he was 8 ½ month old,[12] and again on September 19, 2005, when he was nine months old.[13]  Nystagmus and developmental delays were noted on March 29, 2006, when Q.J.F. was sixteen months old.[14]  On December 31, 2008, when Q.J.F. was four years old, he was uncooperative with vision and hearing examinations, and it was noted that he was not wearing his glasses.[15]  A year

---

[8]     Rec. Doc. 8-1 at 419.

[9]     Rec. Doc. 8-1 at 420.

[10]     Nystagmus is a condition in which the eyes make repetitive, uncontrolled movements, which often result in reduced vision and depth perception and can affect balance and coordination. American Optometric Association, htpps://www.aoa.org/patients-and-public/eye-and-vision-problems/glossary-of-eye-and-vision-conditions/nystagmus (last visited Sept. 6, 2019).

[11]     Rec. Doc. 8-1 at 412.

[12]     Rec. Doc. 8-1 at 407.

[13]     Rec. Doc. 8-1 at 420.

[14]     Rec. Doc. 8-1 at 428.

[15]     Rec. Doc. 8-1 at 394.

later, on December 9, 2009,when he was five years old, it was recommended that he see an eye specialist.[16]  At a pediatric visit on November 23, 2010, when Q.J.F. was six years old, horizontal nystagmus and a systolic murmur were noted, he was wearing glasses, and his vision in both eyes was stated to be 20/100.[17]

When Q.J.F. saw his pediatrician on January 13, 2014,[18] when he was nine years old, it was noted that he had been having headaches over the previous month. It was also noted that he had nystagmus and that his vision was 20/200 with his glasses, which were described as very thick.  He was referred to a cardiologist for his heart murmur.

On February 18, 2014, Q.J.F. saw Dr. Albert M. Gutierrez, a pediatric cardiologist.[19]  Dr. Gutierrez noted that Q.J.F. had been referred for evaluation of a recently detected hear murmur.  Following physical examination, an echocardiogram, and an electrocardiogram, Dr. Gutierrez diagnosed an innocent flow murmur, trivial tricuspid valve regurgitation, trivial pulmonary valve insufficiency, and sinus arrhythmia.  He cleared Q.J.F. to participate in all activities without restrictions and recommended a follow up evaluation in one to two years.

---

[16]      Rec. Doc. 8-1 at 416.

[17]      Rec. Doc. 8-1 at 415.

[18]      Rec. Doc. 8-1 at 390.

[19]      Rec. Doc. 8-1 at 332-333.

Q.J.F. saw Dr. Steven J. Snatic, a neurologist, on March 20, 2014 for headaches.[20]  The treatment note indicated that Q.J.F. experienced headaches approximately ten days per month.  It was noted that Q.J.F. had visual problems caused by congenital nystagmus and wore glasses.  He had previously had a CT scan and an MRI of the brain.  His mother denied that he was having any difficulties in school.  It was noted that he had a big head.  An MRI of the brain obtained the next day, showed an essentially normal brain with minimal to mild right maxillary mucosal thickening.[21]

Q.J.F. saw Dr. Snatic again on April 3, 2014.[22]  His headaches were continuing, and Dr. Snatic recommended treating them with magnesium, Vitamin B2, and CoQ10.

Q.J.F. returned to Dr. Snatic on May 14, 2014.[23]  He was taking magnesium and CoQ10, but had been unable to locate Vitamin B2.  He had experienced about thirteen headaches since the last visit.  Amitryptiline 10 mg. and Ibuprofen were prescribed.

---

[20]     Rec. Doc. 8-1 at 311.

[21]     Rec. Doc. 8-1 at 308-310.

[22]     Rec. Doc. 8-1 at 312.

[23]     Rec. Doc. 8-1 at 313.

When Q.J.F. returned to Dr. Snatic on June 17, 2014, he had had only four headaches the previous month.  He was taken off the magnesium and CoQ10.  He was advised to continue the Amitryptiline and to increase the dosage from 10 mg. to 20 mg. if the headaches worsened.

Q.J.F. saw Dr. Snatic again on September 16, 2014,[24] having had only one or two headaches in the previous three months.  An eventual withdrawal from the Amitryptiline was discussed, provided the headaches remained at a low level.

On September 25, 2014, Q.J.F. was examined by Dr. Harold W. LeDoux, an ophthalmologist.[25]  Dr. LeDoux noted that Q.J.F. was partially sighted with corrected visual acuity of 20/70 or less and also noted that this was a permanent condition.  His primary diagnoses were nystagmus, myopia,[26] and astigmatism.[27] His secondary diagnosis was amblyopia.[28]  He noted that the vision in Q.J.F.'s right

---

[24]     Rec. Doc. 8-1 at 315.

[25]     Rec. Doc. 8-1 at 321-322.

[26]     Myopia or nearsightedness is a vision condition in which close objects are seen clearly, but objects that are farther away are blurry.     American Optometric Association, htpps://www.aoa.org/patients-and-public/eye-and-vision-problems/glossary-of-eye-and-vision-conditions/myopia (last visited Sept. 6, 2019).

[27]     Astigmatism is a condition that causes blurred vision due either to the irregular shape of the cornea or the curvature of the lens inside the eye.  American Optometric Association, htpps://www.aoa.org/patients-and-public/eye-and-vision-problems/glossary-of-eye-and-vision-conditions/astigmatism (last visited Sept. 6, 2019).

[28]     Amblyopia or lazy eye is the loss or lack of development of central vision in one eye that is not correctable with lenses.  American Optometric Association, htpps://www.aoa.org/patients-

eye with best correction was 20/80 while the vision in his left eye with best correction was 20/100.  He noted that Q.J.F.'s vision problems were congenital, stable, and permanent.  He indicated that he should wear his glasses constantly and that his physical activities were unrestricted.

On February 9, 2015, Q.J.F. again saw Dr. Gutierrez, the cardiologist.[29] Physical examination, an echocardiogram, and an electrocardiogram led to diagnoses of innocent flow murmur, trivial to mild tricuspid valve regurgitation and pulmonary valve insufficiency, as well as borderline left ventricular hypertrophy. Q.J.F. remained clear to participate in all activities without any restrictions, and he was to follow up in one year.

In a report signed on February 20, 2015,[30] prepared by the Pupil Appraisal Services of the Lafayette Parish School Board working in conjunction with Ms. Thomas, it was noted that Q.J.F. was referred for evaluation due to a significant visual impairment as well as regular and severe headaches.  At the time, Q.J.F. was ten years old and a student at Ossun Elementary School.  Ms. Thomas reported that he was delayed in development and did not start walking until he was approximately

---

and-public/eye-and-vision-problems/glossary-of-eye-and-vision-conditions/amblyopia        (last visited Sept. 6, 2019).

[29]    Rec. Doc. 8-1 at 334-335.

[30]    Rec. Doc. 8-1 at 224-247.

two years old.  She also reported that he had started speech therapy at two years of age due to delayed speech.  At the time of the report, he was seeing ophthalmologist Dr. Harold LeDoux regularly.  Dr. LeDoux had diagnosed nystagmus, myopia, astigmatism, and amblyopia.  According to Dr. LeDoux, and based on an eye examination on September 25, 2014, Q.J.F.'s distance vision with best correction was 20/80 in his right eye and 20/100 in his left eye, while his near vision with best correction was 20/80 in his right eye and 20/100 in his left eye.  Dr. LeDoux described Q.J.F.'s visual impairment as stable and permanent and advised that he was to wear glasses constantly.  It was noted that, because of his severe vision problems, Q.J.F. experienced regular and severe headaches.  Despite having received speech therapy services when he was younger, Q.J.F. did not then exhibit difficulty with speech or language.  Testing revealed that his broad reading skills, math skills, and written expression skills were in the low average range.

On March 12, 2015, Q.J.F. saw Dr. Snatic again.[31]  He was having only about two headaches per month, and they were less severe.  He denied being depressed or suicidal.  Dr. Snatic suggested weaning him off the Amitryptiline, which could be restarted if the headaches worsened.

---

[31]    Rec. Doc. 8-1 at 316.

On April 15, 2015,[32] an evaluation by Q.J.F.'s fourth grade teacher, Aimee Guidroz, indicated that he had problems in the domain of acquiring and using information because he was unable to read small font sizes.  She stated that if the font size was enlarged, he was able to read "just fine."  She further indicated that he had no problems in the other domains evaluated, i.e., attending and completing tasks, interacting and relating with others, moving about and manipulating objects, and caring for himself.  Ms. Guidroz also noted that, because of his poor vision, Q.J.F. wore glasses and used a magnifying glass, electronic magnifying devises, and large print materials in school.

Q.J.F. saw his pediatrician on November 25, 2015.[33]  It was noted that his headaches were much better.  His cardiac murmur was noted.  It was noted that his vision in both eyes was 20/70 and that he was wearing thick glasses.

Q.J.F. again saw cardiologist Dr. Gutierrez on February 10, 2016.[34]  Dr. Gutierrez again performed a physical examination, an electrocardiogram, and an echocardiogram.  He diagnosed innocent flow murmur, mild tricuspid valve regurgitation with normal pulmonary artery pressures, and mild left ventricular

---

[32]     Rec. Doc. 8-1 at 189-196.

[33]     Rec. Doc. 8-1 at 389.

[34]     Rec. Doc. 8-1 at 365-367.

hypertrophy.  He cleared Q.J.F. to participate in all activities without any restrictions and advised a follow-up evaluation in one year.

Q.J.F. returned to see Dr. Snatic on March 17, 2016.[35]  His headaches were rare, he was off the Amitryptiline, and prescription Ibuprofen worked well when he did have headaches.

On September 3, 2016, Q.J.F.'s pediatrician tested his vision and noted that it was 20/100 in both eyes.[36]

On January 18, 2017, Q.J.F. was seen by Dr. Laurie Sicard, an ophthalmologist at the Azar Eye Clinic.[37]  Her diagnoses were congenital nystagmus, myopia in both eyes, and regular astigmatism in both eyes.  Q.J.F. reported that he had headaches off and on, had seen a neurologist for the headaches, and was no longer taking medication for headaches.  He also reported that his vision was stable with his current glasses and that he was on a vision plan at school that was working well.  Dr. Sicard noted that his distance vision in his right eye with best correction was 20/200, that his near vision in his right eye with best correction was 20/100, that his distance vision in his left eye with best correction was 20/200, and that his near vision in his left eye with best correction was 20/70.

---

[35]    Rec. Doc. 8-1 at 374.

[36]    Rec. Doc. 8-1 at 388.

[37]    Rec. Doc. 8-1 at 376-381.

On May 31, 2017, Q.J.F. again saw Dr. Gutierrez, the cardiologist.[38] Physical examination, echocardiogram testing, and electrocardiogram testing were performed. Dr. Gutierrez's diagnoses were innocent flow murmur, mild left ventricular hypertrophy, mild tricuspid valve regurgitation, and sinus bradycardia. Q.J.F. remained able to participate in all activities without any restriction. He was to follow up in one year.

On July 21, 2017, Q.J.F. and his mother testified at a hearing before the ALJ. Q.J.F. stated that he was twelve years old, in the seventh grade, and wore glasses. He explained that, despite wearing glasses, he still needed help with certain things. He said that he needed to be moved up close to things in class that he could not otherwise see. Similarly, he must sit close to a television set to be able to see it. He explained that he has a magnifying glass to use when reading small print. He stated that he enjoys reading adventure books and uses his magnifying glass when reading them. He also stated that he had an iPad for use in class. He stated that his headaches had gotten a lot better. Ms. Thomas testified that Q.J.F. had been wearing glasses since he was four or five months old. She also confirmed that her primary concern was his eyesight.

---

[38]   Rec. Doc. 8-1 at 427-428.

On July 31, 2017, Q.J.F. had his twelve-year-old wellness exam with his pediatrician.[39]  His vision was noted to be 20/100 in both eyes with glasses.

The record contains a letter from Dr. Sicard, which is dated October 12, 2018 and provides information based on her evaluation of Q.J.F.'s vision on January 18, 2018.  The examination took place about six months after the hearing, and Dr. Sicard's letter was written more than a year after the hearing.  Although Dr. Sicard's examination occurred before the ALJ's decision was issued on March 22, 2018, it does not appear that the ALJ had this evidence available to her when making her determination.  The letter indicated that Q.J.F. reported to Dr. Sicard that he still experienced occasional headaches but also reported that his visual acuity with his glasses was good.  However, the letter also indicated that his visual acuity in his right eye was 20/100 when corrected and was 20/200 in his left eye when corrected but Dr. Sicard did not provide separate numbers for near vision and distance vision.  Dr. Sicard's assessments were congenital nystagmus, alternative exotropia,[40] myopic degeneration in both eyes, regular astigmatism in both eyes, and legal blindness.

---

[39]    Rec. Doc. 8-1 at 387.

[40]    Exotropia is a form of eye misalignment in which one or both of the eyes turn outward.  It is the opposite of crossed eyes.  American Optometric Association, htpps://www.aoa.org/patients-and-public/eye-and-vision-problems/glossary-of-eye-and-vision-conditions/exotropia (last visited Sept. 6, 2019).

Ms. Thomas now seeks reversal of the Commissioner's adverse ruling.  Ms. Thomas filed this action and briefed the relevant issues without the assistance of legal counsel.  Therefore, this Court must liberally construe her arguments and apply less stringent standards in interpreting them than this Court would in the case of a party with legal counsel.[41]

## Analysis

### A.    Standard of Review

Judicial review of the Commissioner's denial of disability benefits is limited to determining whether substantial evidence supports the decision and whether the proper legal standards were used in evaluating the evidence.[42]  "Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[43]  Substantial evidence "must do more than create a suspicion of the existence of the fact to be established, but 'no substantial evidence' will only be found when there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.'"[44]

---

[41]      *Grant v. Cuellar*, 59 F.3d 523, 524 (5th Cir. 1995).

[42]      *Villa v. Sullivan*, 895 F.2d 1019, 1021 (5th Cir. 1990); *Martinez v. Chater*, 64 F.3d 172, 173 (5th Cir. 1995).

[43]      *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983).

[44]      *Hames v. Heckler*, 707 F.2d at 164 (citations omitted).

If the Commissioner's findings are supported by substantial evidence, they are conclusive and must be affirmed.[45]  In reviewing the Commissioner's findings, a court must carefully examine the entire record, but refrain from re-weighing the evidence or substituting its judgment for that of the Commissioner.[46]  Conflicts in the evidence[47] and credibility assessments[48] are for the Commissioner to resolve, not the courts.  Four elements of proof are weighed by the courts in determining if substantial evidence supports the Commissioner's determination:  (1) objective medical facts, (2) diagnoses and opinions of treating and examining physicians, (3) the claimant's subjective evidence of pain and disability, and (4) the claimant's age, education and work experience.[49]

## B.    **Entitlement to Benefits**

Supplemental Security Income ("SSI") is a benefit program for indigent disabled individuals who have not paid into the Social Security system and also for disabled individuals who are receiving Social Security disability benefits, but whose

---

[45]    42 U.S.C. § 405(g); *Martinez v. Chater*, 64 F.3d at 173.

[46]    *Hollis v. Bowen*, 837 F.2d 1378, 1383 (5th Cir. 1988); *Villa v. Sullivan*, 895 F.2d at 1022.

[47]    *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985).

[48]    *Wren v. Sullivan*, 925 F.2d 123, 126 (5th Cir. 1991).

[49]    *Wren v. Sullivan*, 925 F.2d at 126.

monthly benefit amounts are below a certain amount.[50]  In order for an individual

under the age of eighteen to be found disabled and entitled to SSI benefits, he or she

must have a "medically determinable physical or mental impairment, which results

in marked and severe functional limitations, and which can be expected to result in

death or which has lasted or can be expected to last for a continuous period of not

less than 12 months."[51]

## C.    Evaluation Process and Burden of Proof

A three-step process is utilized to determine whether a person under the age

of eighteen is disabled.[52]  At step one, it must be determined whether the claimant is

engaging in substantial gainful activity.  A child claimant who is engaging in

substantial gainful activity will be found not disabled regardless of his or her medical

condition, age, education, or work experience.[53]

At step two, it must be determined whether the claimant has a medically

determinable impairment or a combination of medically determinable impairments

that is severe.  A child found to have a slight abnormality or a combination of slight

---

[50]    See 42 U.S.C. §§ 1381-1383f.

[51]    42 U.S.C. § 1382c(a)(3)(C)(i).

[52]    20 C.F.R. § 416.924; *Lopez v. Barnhart*, 176 Fed. App'x 618, 619 (5th Cir. 2006).

[53]    20 C.F.R. § 416.924(b).

abnormalities that cause no more than minimal functional limitations will be found not disabled.[54]

At step three, it must be determined whether the claimant has an impairment or combination of impairments that meets or medically equals the criteria of a listing or that functionally equals a listing.[55] When the impairments do not meet or equal a listed impairment, the Commissioner will evaluate the functional limitations caused by the child's impairments to determine whether they are disabling.[56]

To evaluate functional equivalence at step three, the Commissioner considers how a child functions in her activities in terms of six domains of functioning.[57] The six domains are: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for oneself; and (6) health and physical well-being.[58] Functional equivalence means that the impairment is of listing-level severity and results in "marked" limitations in two of the six domains of functioning or an "extreme"

---

[54]     20 C.F.R. § 416.924(c).

[55]     20 C.F.R. § 416.972.

[56]     20 C.F.R. § 416.926a.

[57]     20 C.F.R. § 416.926a(b)(1).

[58]     20 C.F.R. § 416.926a(b)(1), (g)-(l).

limitation in one domain.[59]    A "marked" limitation in a domain is when an impairment interferes seriously with the child's ability to independently initiate, sustain, or complete activities.[60]  An "extreme" limitation interferes very seriously with the child's ability to independently initiate, sustain, or complete activities.[61]

A child who has been found disabled must periodically undergo a continuing disability review to determine if he or she is still eligible for disability benefits.[62] The Commissioner first evaluates whether there has been medical improvement in the impairments the claimant had at the time of the most recent favorable determination, i.e., the comparison point date ("CPD").[63]  If there has been medical improvement, the Commissioner next considers whether the impairments the claimant had at the time of the CPD still meet, or medically or functionally equal, the severity of the listing applicable at that time.[64]  If they do not, the Commissioner proceeds to consider whether the claimant's current impairments are disabling under the same rules used to make the initial determination of disability.[65]  Thus, if the

---

[59]    20 C.F.R. § 416.926a(a).

[60]    20 C.F.R. § 416.926(e)(2).

[61]    20 C.F.R. § 416.926(e)(3).

[62]    20 C.F.R. § 416.994a(a).

[63]    20 C.F.R. § 416.994a(b)(1); Social Security Ruling ("SSR") 05–03p.

[64]    20 C.F.R. § 416.994a(b) (2); SSR 05–03p.

[65]    20 C.F.R. § 416.994a(b)(3); SSR 05–03p.

claimant's previously disabling impairment no longer meets or equals a listed impairment, the finder of fact determines whether all of the claimant's impairments are currently disabling, including any impairments that were not present at the time of the prior disability determination.[66]  The determination of current disability applies the same sequential steps used for initial child's disability determinations, as described above.[67]

## D.    The ALJ's Findings and Conclusions

In this case, the ALJ found that, at the CPD of April 10, 2007, Q.J.F. had speech and language delays that were disabling.  There is no contrary evidence in the record.

The ALJ further found that medical improvement occurred as of May 1, 2015. This finding is supported by substantial evidence in the record.  In particular, Ms. Thomas filled out a questionnaire on February 9, 2015 in which she noted that Q.J.F. was not receiving special therapy for his speech and hearing impairments.[68]

The ALJ found that, since May 1, 2015, the impairments that Q.J.F. had at the time of the CPD did not functionally equal a listed impairment.  Ms. Thomas did not challenge this finding.

---

[66]    20 C.F.R. § 416.994a(a)(3).

[67]    20 C.F.R. § 416.994a(a)(3)(I)-(iii).

[68]    Rec. Doc. 8-1 at 164.

The ALJ next found that, since May 1, 2015, Q.J.F. had the following severe impairments:  nystagmus, myopia, astigmatism, and amblyopia.  This finding is supported by substantial evidence in the record.

The ALJ found that, since May 1, 2015, Q.J.F. has not had an impairment or combination of impairments that meets or medically equals a listed impairment.  Ms. Thomas challenged this finding.

The ALJ found that, since May 1, 2015, Q.J.F. had not had an impairment or combination of impairments that functionally equals a listed impairment.   Ms. Thomas challenged this finding.

Finally, the ALJ found that Q.J.F.'s disability ended on May 1, 2015 and he did not become disabled again thereafter.  Ms. Thomas challenged this finding.

## E.    **The Allegations of Error**

This Court interprets Ms. Thomas's brief as alleging that the ALJ erred (1) because she was biased and did not give Q.J.F. a full and fair hearing; (2) in finding that Q.J.F.'s testimony and complaints of visual impairments and legal blindness were not credible; and (3) in finding that Q.J.F. did not become disabled again after May 1, 2015.

## F.    **Was the ALJ Biased?**

Ms. Thomas contends that the ALJ was biased against her son and did not conduct a full and fair hearing.  However, there is no evidence in the record

supporting this contention.  To the contrary, the record indicates that Q.J.F. and Ms. Thomas were both given a full and fair opportunity to testify at the hearing. Therefore, the allegation of bias lacks merit and is not a valid basis for reversing the Commissioner's decision.

## G.    <u>Did the ALJ Err in Finding the Claimant Not Credible?</u>

Ms. Thomas contends that the ALJ erred in finding that either she or Q.J.F. was not credible.  In her ruling, the ALJ found that Q.J.F.'s vision impairment is severe but further found that it did not meet, medically equal, or functionally equal the severity of a listed impairment.  In reaching this conclusion, the ALJ stated that "[t]he objective evidence does not support the degree of limitation alleged by claimant."[69]  This Court does not consider this statement to be a comment on the credibility of the testimony given by Q.J.F. or Ms. Thomas at the hearing or in their various submissions to the record.  Instead, this Court finds that the ALJ was simply stating that she did not find that the evidence regarding Q.J.F.'s visual impairments supported a finding that his visual impairments were disabling.  This Court located no other statements in the ALJ's ruling that could be interpreted as adverse credibility findings.  Therefore, this allegation of error lacks merit.

---

[69]    Rec. Doc. 8-1 at 33.

**H.**    **Did the ALJ Err in Failing to Find Q.J.F. Disabled?**

The ALJ found that Q.J.F.'s visual impairment does not meet, medically equal, or functionally equal the criteria of a listed impairment and therefore found that it is not disabling.  Ms. Thomas contends, however, that the ALJ erred in failing to find that Q.J.F.'s visual impairment is disabling.  This Court agrees.

Although the ALJ identified the listings that she considered in reaching her conclusion that Q.J.F.'s visual impairment did not meet a listing, specifically mentioning Listings 102.01, 102.03, and 102.04, she did not compare the criteria of those listings against the evidence in the record and explain why the criteria was not satisfied.  An "ALJ is required to discuss the evidence and explain the basis for his findings at each unfavorable step of the sequential evaluation process."[70]  More particularly, "[t]he ALJ should identify the listed impairment for which the claimant's symptoms fail to qualify and provide an explanation as to how he or she determined that the symptoms are insufficiently severe to meet any listed impairment."[71]  In this case, the ALJ did not do so.  Instead, the ALJ simply stated that Q.J.F.'s "impairments do not meet or equal any listed impairment for the period

---

[70]    *Williams v. Astrue*, No. 09-0130, 2010 WL 989216, at * 3 (W.D. La. Mar. 15, 2010), citing *Audler v. Astrue*, 501 F.3d 446, 448 (5th Cir. 2007), which in turn cites 42 U.S.C. § 405(b)(1).

[71]    *Savoie v. Colvin*, No. 14-30-JJB-RLB, 2015 WL 1004217, at *5 (M.D. La. Mar. 5, 2015).

he alleges he is disabled."[72]  The ALJ's failure to compare the claimant's symptoms with the criteria of relevant listings resulted in a failure to apply the proper legal standard as well as a failure to support her findings with substantial evidence.  This error mandates remand of the ALJ's decision.

For purposes of Social Security, statutory blindness is defined as central visual acuity of 20/200 or less in the better eye with the use of a correcting lens.[73]  A person who is blind and otherwise eligible is entitled to receive Social Security benefits.[74] There also are other criteria for listed visual impairments.  In her report of January 18, 2017, Dr. Sicard provided information indicating that Q.J.F. was statutorily blind, but it is not apparent from the reports of Dr. LeDoux and Dr. Sicard whether Q.J.F. has a visual impairment that satisfies any other listing criteria.   More important, the ALJ did not discuss statutory blindness or any other listing criteria or explain how Q.J.F.'s conditions and impairments compared to the necessary requirements.

In evaluating whether Q.J.F. became disabled after his speech and language impairment improved due to vision problems that functionally equal a listing, the ALJ relied primarily upon Dr. Sicard's ophthalmological examination of January 18,

---

[72]      Rec. Doc. 8-1 at 32.

[73]      20 C.F.R. Pt. 404, Subpt. P, App. 1 – Listing 102.00(A)(2)(a).

[74]      42 U.S.C. § 1381a.

2017.  The ALJ stated that Dr. Sicard found that Q.J.F.'s visual acuity, at that time, was best corrected to 20/100 in his right eye and 20/70 in his left eye.  But those numbers only reflect his near vision.   Listing 102.00, the listing for visual impairments in children, states that visual acuity is to be measured by reference to distance vision not near vision.  "When we need to measure your best-corrected central visual acuity, which is your optimal visual acuity attainable with the use of a corrective lens, we use visual acuity testing *for distance* that was carried out using Snellen methodology or any other testing methodology that is comparable to Snellen methodology."[75]  Therefore, the ALJ's evaluation of the severity of Q.J.F.'s visual impairment should have been restricted to his distance vision rather than his near vision.  Had the ALJ considered the information set forth in Dr. Sicard's report regarding Q.J.F.'s distance vision, she would have noticed that his distance vision was best corrected to 20/200 in his both eyes, according to Dr. Sicard, satisfying the criteria for statutory blindness.  But the ALJ failed to refer to these findings by Dr. Sicard in her decision.

In reaching her conclusions, the ALJ also relied upon a teacher questionnaire dated April 15, 2015, which was completed approximately two years before Dr. Sicard's examination referenced in the preceding paragraph.  In September 2014,

---

[75]    20 C.F.R. Pt. 404, Subpt. P, App. 1 – Listing 102.00(A)(5)(a) [emphasis added].

seven months before Q.J.F.'s teacher filled out the questionnaire, Dr. LeDoux had examined Q.J.F. and found that the vision in his right eye with best correction was 20/80 while the vision in his left eye with best correction was 20/100.  Assuming that Dr. LeDoux meant that those measurements applied to Q.J.F.'s distance vision, there was a significant deterioration in Q.J.F.'s visual acuity between Dr. LeDoux's test in 2014 and Dr. Sicard's test in 2017.  There is no indication that the ALJ took that deterioration in visual acuity into account.  The record also contains the results of further testing by Dr. Sicard in January 2018 indicating that the visual acuity in Q.J.F's right eye was 20/100 while that in his left eye was 20/200 but did not distinguish near vision from distance vision.  A new prescription for glasses was written at that time and additional diagnoses were added, including myopic degeneration and alternating exotropia.  Also, in Dr. Sicard's opinion, Q.J.F. was legally blind at that time.  The ALJ did not discuss whether the information provided by Dr. Sicard was sufficient to establish that Q.J.F.'s visual impairments met, medically equaled, or functionally equaled the criteria of the listings she cited.  This was error that requires remand of this matter for further evaluation.

In determining whether Q.J.F.'s visual impairment was functionally equivalent to a listed impairment, the ALJ also relied upon the teacher's report from 2015, before the noted deterioration in his vision, and gave only a cursory nod to each of the six functional domains.  For example, the ALJ found that Q.J.F. had less

than a marked limitation in acquiring and using information even though he "has difficulty reading materials without magnification or enlarged font."[76]  Similarly, the ALJ found that Q.J.F. had no limitation in attending and completing tasks.[77]  This conclusion was reached although the record evidence is clear that, even before the deterioration in his vision, Q.J.F. had to be physically situated close to school activities and had to use magnifying devices or enlarged print materials in order to participate in and complete tasks that require reading or visual attention.

The Social Security regulations define the term "marked" as follows:

> We will find that you have a "marked" limitation in a domain when your impairment(s) interferes seriously with your ability to independently initiate, sustain, or complete activities.  Your day-to-day functioning may be seriously limited when your impairment(s) limits only one activity or when the interactive and cumulative effects of your impairment(s) limit several activities.  "Marked" limitation also means a limitation that is "more than moderate" but "less than extreme."

While this Court cannot reweigh the evidence, this Court is certain that a child will encounter difficulty in independently initiating, sustaining, or completing assignments in class or at home and will encounter difficulties in attending and completing tasks when his ability to do so depends upon the availability of reading materials with enlarged text, magnification devices, or being physically located in close proximity to the activities included in the curriculum.  Therefore, this Court

---

[76]    Rec. Doc. 8-1 at 33.

[77]    Rec. Doc. 8-1 at 33.

concludes that the ALJ failed to properly apply the definition of the term "marked" in evaluating the evidence related to the domains of acquiring and using information and attending and completing tasks since there is no substantial evidence in the record suggesting that Q.J.F. had less than marked limitation in those two functional domains, particularly after the deterioration of his eyesight between 2015 and 2017 or 2018.

In this case, the Commissioner met his burden of establishing that the impairments that led to Q.J.F.'s having been found disabled in 2007 had improved and were no longer disabling by May 2015.  However, the ALJ erred in determining whether Q.J.F.'s visual impairments – alone or in combination with any other impairments he might have – resulted in a new disability thereafter.  The ALJ did not apply the proper standards in determining whether Q.J.F.'s impairments met, medically equaled, or functionally equaled the criteria of any relevant listed impairments.  Further, this Court finds that the ALJ's finding that Q.J.F. does not have an impairment that meets, medically equals, or functionally equals a listed impairment is not supported by substantial evidence in the record.  This matter should, therefore, be remanded for further evaluation.

## <u>Conclusion and Recommendation</u>

Accordingly, this Court recommends that the Commissioner's decision be REVERSED and REMANDED to the Commissioner pursuant to the fourth sentence

of 42 U.S.C. § 405(g) with instructions to again evaluate whether Q.J.F.'s visual impairment, alone or in combination with any other impairments he may have, meets, medically equals, or functionally equals the criteria of any listed impairments. Q.J.F. shall be permitted to submit updated evidence and to testify at another hearing.    The Commissioner shall also consider providing a consultative examination by an ophthalmologist.    Inasmuch as the reversal and remand recommended herein falls under sentence four of Section 405(g), any judgment entered in connection herewith will be a "final judgment" for purposes of the Equal Access to Justice Act (EAJA).[78]

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Rule Fed. R. Civ. P. 72(b), parties aggrieved by this recommendation have fourteen days from receipt of this report and recommendation to file specific, written objections with the Clerk of Court.  A party may respond to another party's objections within fourteen days after receipt of a copy of any objections or responses to the district judge at the time of filing.

Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in the report and recommendation within fourteen days following the date of receipt, or within the time frame authorized by

---

[78]    See, *Richard v. Sullivan*, 955 F.2d 354 (5th Cir. 1992), and *Shalala v. Schaefer*, 509 U.S. 292 (1993).

Fed. R. Civ. P. 6(b) shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the district court, except upon grounds of plain error.[79]

Signed in Lafayette, Louisiana, this 16th day of September 2019.

_____
PATRICK J. HANNA
UNITED STATES MAGISTRATE JUDGE

---

[79]    See *Douglass v. United Services Automobile Association*, 79 F.3d 1415 (5th Cir. 1996) (en banc), superseded by statute on other grounds, 28 U.S.C. § 636(b)(1).